**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **BRUCE GREEN,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 09 C 432 |
| **FED EX NATIONAL LTL, INC.,** | ) ) Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bruce Green worked for Defendant FedEx National LTL, Inc. ("FedEx") as a Pick Up and Delivery Driver ("P & D Driver") until August 2007, when he was discharged after failing to complete a task scheduled during his overtime hours. In this lawsuit, Green asserts that his discharge was in fact racially motivated. Defendant FedEx has moved for summary judgment, but for the reasons explained here, the court concludes that Green has offered sufficient circumstantial evidence of discrimination to reach a jury. FedEx's motion for summary judgment is thus denied. The court notes, however, that this may be a "mixed motive" case; thus, even if Plaintiff can prove a racial motivation for his termination, FedEx will not be liable if it can show that he would have been terminated regardless of the alleged unlawful motivation.

## BACKGROUND

### A. Factual Background

Plaintiff Bruce Green began his employment with Watkins Motor Lines in 2005, and worked there until Watkins' assets were purchased by FedEx. (Def.'s Rule 56.1 Statement of Material Facts (hereinafter "Def.'s SOF") at ¶ 5.) Beginning on or about September 3, 2006, Green worked for FedEx as a P & D Driver from the FedEx terminal in Lyons, Illinois. (Def.'s SOF at ¶ 7.)

Green signed a written acknowledgment that FedEx was adopting Watkins' Employee Handbook with certain changes, effective August 2, 2006. (Def.'s SOF at ¶ 8, 9.) Then, in or around February 2007, FedEx distributed an updated Employee Handbook (hereinafter "2007

Handbook"), identifying certain conduct that could result in termination. (*Id.* at ¶ 10.) The 2007 Handbook included provisions for "Progressive Corrective Action," in which an employee being disciplined would receive three stages of warnings—"Verbal Problem Solving Discussions," "Written Corrective Action," and "Final Written Warning"—before the final penalty of "Termination." (FedEx Employee Handbook at 2-3, Ex. 9 to Def.'s SOF.) The policy provided that ordinarily, "termination occurs when an employee's performance or conduct problems continue following prior corrective action." (*Id.* at 3.) It makes clear, however, that "under certain circumstances, termination may occur without prior corrective action, depending upon the severity of the conduct at issue." (*Id.*) The 2007 Handbook includes a non-exhaustive list of examples of conduct that are subject to corrective action, including: "[u]nsatisfactory work performance, attitude, and/or behavior patterns, inefficiency or lack of application or effort on the job" and "[f]ailure to perform assigned duties or to accept work as assigned by a supervisor, or failure to take instruction from any individual assigned by the supervisor." (*Id.*) The 2007 Handbook does not specifically identify consequences for failure to perform a task requiring overtime work (*id.* at 24), but FedEx employees testified that, when assigned, overtime work was mandatory. (*See* Kearney Dep. at 137:2-3, Ex. 15 to Def.'s SOF ("To the best of my knowledge, you cannot refuse overtime work at FedEx."); Wright Dep. at 34:1-7, Ex. 13 to Def.'s SOF (confirming that FedEx requires employees to work overtime on occasion).)

As of August 2007, Green reported directly to dispatcher Bobby Jones and to the service center manager, Marty Howland. (Def.'s SOF at ¶ 16.) Jones's job as the dispatcher was to supervise the P&D drivers and their runs. (*Id.* at ¶ 17.) On August 3, 2007, Green was directed to make a pick-up at a Sony Music station. (*Id.* at ¶ 18.) The load was not ready when Green arrived, however, so Green called Lyons Terminal's dispatch office, and Howland instructed him to make a separate pick-up and delivery before returning to Sony to pick up the delayed load. (*Id.* at ¶ 19-22.) Howland advised Green that he would be eligible for overtime if he worked beyond his scheduled work hours. (*Id.* at ¶ 23.) It is undisputed that Green did not tell Howland whether or not

2

he would comply with his instructions. (*Id.* at ¶ 24.) What happened next is a matter of dispute. According to FedEx, upon Green's return to Lyons Terminal with the second load, he received paperwork from Jones directing him to return to the original Sony station as Howland had instructed. (*Id.* at ¶ 25.) In support, FedEx cites Jones's deposition testimony that he handed Green a "manifest" instructing him to perform the original Sony job. (Jones's Dep. at 73:6-18, Ex. 14 to Def.'s SOF.) Green insists that he was not given a manifest to return to the original Sony location when he returned to the Lyons Terminal. (Pl.'s Local Rule 56.1(b)(3) Resp. and Counterstatement to Def.'s Local Rule 56.1(a)(3) Statement of Material Facts (hereinafter "Pl.'s Resp.") at ¶ 25.) Green did not in fact return to the original Sony location to pick up the previous load; he left Lyons Terminal for the day after informing Jones that he could not perform the pick-up. (Def.'s SOF at ¶ 27, 28.)

At Howland's request, Jones prepared an e-mail report concerning the incident. Also at Howland's request, Jones made several changes to the report after it was complete, and although he could not recall the specifics, Jones testified at his deposition that the changes he made were "inaccurate." (Def.'s SOF at ¶ 29; Pl.'s Resp. at ¶ 29; Jones's Dep. at 80:1-14, Ex. 14 to Def.'s SOF.) Relying on the information in this e-mail message, Howland determined that Green should be terminated for refusal to carry out a direct work order. (Def.'s SOF at ¶ 31.) Green's termination was approved by various levels of FedEx National Management, including the Regional Human Resources Manager, the Senior Human Resources Manager, and the Vice President of Human Resources. (*Id.* at ¶ 32.) As part of the process of reviewing the termination decision, Dan Kearney, the Regional Human Resources Manager for FedEx's Lyons Terminal at the time of Green's termination, conducted an investigation of the incident. (*Id.* at ¶ 33, 34.) Kearney approved of the discharge, as did the Human Resources Senior Manager Ted Clinnin, Managing Director of Operations Butch Davis, District Manager Scott Kaman, and Vice President of Human Resources Steve Newhouse. (*Id.* at ¶ 33, 34.) On August 9, 2007, Howland informed Green that

he was terminated for "refusing a work assignment." (*Id.* at ¶ 35.)

**B.     Procedural History**

Green filed a charge of discrimination on September 11, 2007 with the Illinois Department of Human Rights, and was granted notice of a right to sue by the U.S. Equal Employment Opportunity Commission on January 6, 2009. (Ex. A to Pl.'s Resp.) On January 22, 2009, Green filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Pl.'s Compl. ¶ 4.) In his complaint, Green alleged that his termination was racially motivated, and requested reinstatement, back pay and front pay and associated benefits, and compensatory and punitive damages. (*Id.* at 4.) FedEx's motion for summary judgment is now before the court.

## DISCUSSION

**A.     Summary Judgment Standard**

The court will grant summary judgment where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The party seeking summary judgment "bears the initial responsibility of informing the court of the basis for its motion. . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the moving party has met its burden in showing that there is no genuine issue of material fact, the nonmoving party must offer "admissible evidence" to support his allegations. *McKenzie v. Ill. Dep't. of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996). The moving party will prevail if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.*, 477 U.S. at 323.

**B.     Title VII Standard**

To establish a claim of race discrimination, Green can proceed either by the "indirect" or "direct" method of proof. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849-50 (7th Cir. 2010). Under the "indirect" or "burden-shifting" method, Green makes a prima facie case of discrimination by presenting evidence that (1) he is a member of a protected class; (2) his job

4

performance met FedEx's legitimate expectations; (3) he suffered from an adverse employment action; and (4) some other similarly situated individual outside of his protected class was treated more favorably. *Id.* at 850 (citation omitted). FedEx is then entitled to present evidence of "legitimate, nondiscriminatory" reasons for its actions, and if it does so, Green bears the burden of showing that FedEx's purported legitimate reason(s) for his discharge were merely pretextual. *Id.*

Under the direct method of proof, Green can prevail at summary judgment by presenting evidence from which the jury "could find that the adverse employment action was taken for a discriminatory reason." *Jones v. City of Springfield,* 554 F.3d 669, 671 (7th Cir. 2009), citing *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Such evidence can be in the form of direct evidence from FedEx—for example, an admission of discriminatory animus—or, more commonly, circumstantial evidence of discrimination. *Nagle v. Village of Calumet* Park, 554 F.3d 1106, 1114 (7th Cir. 2009). The Seventh Circuit recognizes that circumstantial evidence may include

> (1) suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Id.* at 1114-15. To prevail under this method, plaintiff must present a "convincing mosaic" of evidence that would support an inference of intentional discrimination by FedEx. *Rhodes v. Ill. Dep't. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

FedEx argues that Green is unable to survive summary judgment under either the direct or indirect methods of proof. Green focuses on the direct method, and the court concludes, for the reasons explained here, that genuine issues of fact preclude summary judgment under that method

5

of proof.[1]

**1.    Direct Method**

In his opposition to FedEx's motion for summary judgment, Green argues that "this case is nothing but a direct evidence case." (Pl.'s Opposition at 8.)  FedEx denies that there is any evidence of an admission from FedEx or any of Green's former direct supervisors that Green's discharge was racially motivated (Def.'s Reply at 3), and the court agrees.  The record does not contain any direct admission from FedEx of a discriminatory motive, sufficient on its own to defeat summary judgment.  Indeed, Green testified that he had never personally heard Howland or any other FedEx employee make any derogatory racial comments towards himself or other employees. (Green's Dep. at 56:20-24; 57:1-3, Ex.3 to Def.'s SOF.) *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (absent an admission that the plaintiff was terminated because of his age, the court would analyze plaintiff's case under the direct method of proof through circumstantial evidence).

Instead, Green offers circumstantial evidence in support of his claim.  At least some of this evidence is hearsay: Green asserts that Jones told him that Howland's decision to initiate the termination process was racially motivated. (Pl.'s Opp'n at 7.)  Specifically, Green testified that Jones told him about a conversation in which Howland told Jones that "FedEx ought to get rid of all the nigger drivers" and that "[he] was out to get the fucking niggers." (Green's Dep. at 86:20-23, Ex. 3 to Def.'s SOF.)  In addition, Green claims that when Howland instructed Jones to rewrite the e-mail to FedEx management requesting Green's termination, Howland warned Jones, "if you don't

---

[1]    As FedEx correctly observes, Green sometimes confuses the standards for proving his case.  Thus, Green's brief conflates "direct evidence" with "direct method of proof," which is established through either direct evidence *or* circumstantial evidence. In addition, Green confuses "circumstantial evidence" with the "indirect method of proof." (*See* Def.'s Reply at 4, n.3.) As the Seventh Circuit has acknowledged, however, one of the three types of evidence that is referred to as circumstantial evidence is in fact "substantially the same evidence" as required under the indirect method. *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

comply with my plan to get rid of the niggers, you're done." (Green Dep. at 86:8-10, Ex. 3 to Def.'s SOF.) Green testified that he learned about these comments during a conversation in September 2007, when Jones telephoned him to "clear his conscience." (Green Dep. at 86:15; 87:12; 95:9; 98:11, Ex. 3 to Pl.'s Resp.) FedEx argues that, since Green had no personal knowledge of any of Howland's statements to Jones, the court should consider his testimony as speculative and hearsay, thus inappropriate for the purposes of summary judgment. (Def.'s Reply at 6.) Assuming that Jones's "conscience clearing" statements were not made in the scope of his employment as a FedEx manager, the court agrees that Green's testimony about those statements would be hearsay. *See Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989); *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) (plaintiff's own speculation, which was based upon rumor and conjecture, was not enough to overcome summary judgment).

Some of Jones's statements are admissible, however, because Jones himself was deposed and testified concerning his interactions with Howland. Jones testified about an episode in August 2007, when he and Howland were walking in the work yard in August 2007. According to Jones, Howland told him that "[Jones] was to get rid of the blacks or [Howland] was going to get rid of [Jones]."[2] (Jones Dep., 62:8-9, 13-15, 23-24, Ex. L to Pl.'s Resp.) In addition, when questioned by counsel to recall a specific incident in which Howland used the term "nigger," Jones recalled a fishing trip sometime in 2007 during which Howland threatened that "he wanted me to get rid of him or—I don't remember specifically what he said. He was going to get rid of me." (Jones Dep. at 61:12-21, Ex. L to Pl.'s Resp.) Although it is unclear from the record who Jones meant by "him," the court can infer that it referred to a person of color, as Jones testified that his immediate response to Howland's comment was, "I wasn't a racist and I wasn't going to behave that way." (*Id.* at 62:1-2.)

---

[2] It is unclear from Jones's deposition testimony if this alleged remark in the work yard occurred prior to, pending, or after Green's discharge.

Jones's account of the conversations on the fishing trip is corroborated by the deposition of Barry Englehardt, a FedEx employee who also took part in the fishing trip with Jones and Howland. According to Englehardt, Howland made several derogatory comments throughout the course of the trip. Englehardt testified that Howland's first comment was that "we need to get rid of all these nigger drivers because they're all slackers." (Englehardt's Dep. at 36:8-11, Ex. W to Pl.'s Resp.) Later that same day, Englehardt stated, Howland repeated an "offhanded comment" that "'[w]e need to get rid of these slackers, and we gotta find a way to get rid of these guys.'" (*Id.* at 42:16-18.) When asked by counsel who were "these guys" to whom Howland was referring, Englehardt expressed his belief that Howland was referring to the black drivers. (*Id.* at 43:3-5.) The following day, according to Englehardt, Howland again commented that if "[Jones] doesn't get rid of the black drivers, [Howland was] gonna put the little gay dispatcher sitting right next to him and make [Jones's] life miserable until he quits." (*Id.* at 48:19-20; 49:9-20.)

Howland acknowledges that he went on two fishing trips with Jones but says has declared that there were "no racial slurs or comments made by me to Mr. Jones on either trip." (Howland Declaration, Ex. 4 to Def.'s 56(a)(3) Statement). Assuming for purpose of summary judgment that Howland did make the alleged statements, FedEx insists that Green nevertheless has failed to establish "evidence of a link between his protected status and the adverse employment action" necessary to make out a race discrimination claim. (Def.'s Reply at 6.) Indeed, evidence of racist remarks alone are in many circumstances insufficient to prevail at summary judgment. *See Gorence v. Eagle Food Ctrs, Inc.*, 242 F.3d 759 (7th Cir. 2001), citing *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir. 2000) ("[B]igotry . . . is actionable only if it results in injury to a plaintiff; there must be a real link between bigotry and an adverse employment action."). Particular remarks support an inference of discrimination only where they are: "(1) made by the decision maker of the employment action, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth*, 476 F.3d at 491 (citation omitted).

8

The court believes the test is met here. FedEx urges that Howland was not a decision maker because the decision to discharge Green was approved by multiple levels within the FedEx hierarchy and occurred only after an investigation by management officials. (Def.'s Reply at 7.) The significance of Howland's role in the decision, however, is disputed. Howland was the manager of the service center where Green worked, and had substantial authority to initiate and influence his termination. And even if Howland lacked authority on his own to carry out Green's discharge, his motivations may be relevant under the "cat's paw" doctrine. *See Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 917 (7th Cir. 2007) (citations omitted) ("[W]here an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment nonetheless uses her 'singular influence' over an employee who does have such power to harm the plaintiff for racial reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII.").

The Seventh Circuit has cautioned that an offensive comment must be made in "temporal proximity" and "in reference" to the challenged employment action. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 576 (7th Cir. 2003). In this case, at least one of Howland's alleged racist remarks was made at or near the time of the decision to terminate Green in August 2007: there is evidence that during the same month that Green was terminated, Howland threatened Jones with discharge if he failed to "get rid of the blacks." This testimony may be sufficient to support the inference that Howland's decision to terminate Green was unlawfully motivated.

Such an inference is bolstered by the evidence of comments Howland allegedly made during a fishing trip. Both Jones and Englehardt testified about these comments. Englehardt specifically recalled at least three incidents during the fishing trip in which Howland referenced a desire to "get rid of" the black drivers, and one instance in which, Englehardt claims, Howland threatened Jones with discharge should Jones fail to comply with this plan. In an affidavit, Howland

declared that the fishing trip occurred on March 30, 2007, approximately four months before Green's discharge. (Ex. 4 to Def.'s Reply.) Given the time gap, FedEx urges, Howland's purported remarks are too remote to create a dispute of fact concerning the motivations for the discharge decision. (Def.'s Reply at 7.) But the Seventh Circuit has instructed that "[t]he district court may not view recency alone as the decisive factor." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 524 (7th Cir. 2008) citing *Paz v. Wauconda Healthcare & Rehabilitation Ctr, LLC*, 464 F.3d 659 (7th Cir. 2006). Indeed, even if Howland's comments were made as much as four months prior to Green's termination, those comments appear to refer specifically to Howland's purported plan to discharge his black employees. If the jury believes the comments were made, they may support an inference of discrimination. In short, the alleged comments during the fishing trip, together with evidence concerning the threat that Jones claims Howland voiced in the work yard in August 2007, are sufficient to create a mosaic of evidence of discrimination. *See Hasan*, 552 F.3d at 528 (citation omitted) ("[E]vidence that would be weak if considered alone can, if bolstered by other facts on the record, support an inference of discrimination.").

    **2.**     **Indirect Method**

Green relies exclusively on the direct method to prove his case and, as explained, the court concludes the evidence he presents is sufficient to survive summary judgment under that method. FedEx devotes significant attention in its briefs to discussion of the indirect method, or burden-shifting method, as well. And, as FedEx demonstrates, apart from evidence of comments made by Howland, described above, Plaintiff has made no effective effort to challenge FedEx's assertion that it had a legitimate, non-discriminatory reason for Green's termination: Green's refusal to carry out an overtime assignment.

FedEx asserts that Green's conduct defeats any claim that Green was meeting his employer's legitimate expectations prior to his termination. Moreover, FedEx notes, Green makes no effort to identify any similarly situated employees outside of his protected class who were treated

10

more favorably. (Def.'s Reply at 11.) The nature of its business, FedEx asserts, renders it essential that employees perform timely pick-ups and deliveries. (*Id.* at 12.) FedEx's failure to issue progressive discipline has no significance, Defendant contends; FedEx's national policies provide that an employee can be terminated for failing to perform an assigned duty or accept work *without* prior corrective action. (*Id.*)

Green is suspicious of FedEx's reliance on his refusal to accept an overtime assignment. He asserts that FedEx never warned its drivers that refusal to work overtime could result in termination and did not in fact make overtime work mandatory. (Pl.'s 56.1(b)(3) Resp. ¶¶ 67, 70, citing Howland Dep. at 136, Ex. S to Pl.'s Opp'n; Clinnin Dep. at 226-27, Ex. R to Pl.'s Opp'n.) He notes, further, that FedEx was engaged in an effort to cut overtime work for P & D drivers at the time he was terminated. (Pl.'s Opp'n at 12.) Indeed, Jones testified that there was a "big push to cut overtime"; but other FedEx employees—Wright and Kearney—testified that when overtime work was given, it was mandatory. (Jones Dep. at 74:2-4, Ex. L to Def.'s Reply; *see* Kearney's Dep. at 137:2-3, Ex. 15 to Def.'s SOF; Wright Dep. at 34:1-7, Ex. 13 to Def.'s SOF.) And, although there was some evidence suggesting that Green had a family obligation that interfered with the second pick-up, it is undisputed that he never informed Howland, who had given him the assignment, that he would not complete the job. (*See* Jones Dep. at 73:4-14, Ex. L to Def.'s Reply.) FedEx's alleged failure to warn its drivers that refusing overtime work was a terminable offense does not satisfy the court that Green was meeting his employer's legitimate expectations. Nor has Green offered any evidence that any other worker who refused an overtime assignment was treated more favorably. He argues that FedEx has not identified "a single white employee terminated for refusing overtime" (*see* Pl.'s Opp'n at 12)—but it is Green, not FedEx, who ordinarily bears the burden of proof to establish this under the indirect method of proof.

3. **Mixed Motive Analysis**

Although Green's case survives summary judgment under the direct method of proof, the

evidence that FedEx had a legitimate reason for discharging him remains relevant. If FedEx can show that it would have terminated Green regardless of Howland's views, it will prevail at trial under a "mixed-motive" analysis—an analysis that remains viable in race discrimination cases, such as this one. As the Seventh Circuit explained recently, an employer may violate Title VII when it relies on a prohibited consideration—in this case, race—in reaching an employment decision, even if that prohibited factor was not the only reason for its decision. But the employer has no liability for a mixed-motive employment decision if it would have made the same decision even in the absence of the illegal motive. *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 959 (7th Cir. 2010), *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 244-45, 258, 109 S. Ct 1775, 1786, 1787-88, 1795 (plurality); *id.* at 261, 109 S. Ct. at 1796 (White, J., concurring in the judgment); *id.* at 261, 279, 109 S. Ct. at 1796, 1806 (O'Connor, J., concurring in the judgment). The employer bears the burden of persuasion on this issue; that is, in this case, if Plaintiff Green proves "that a proscribed criterion played a motivating role" in his termination, (*Serwatka*, 591 F.3d at 959 (citations omitted)), FedEx can nevertheless defeat his case if it is able to prove by a preponderance of the evidence that he would have been terminated even absent that criterion.

**CONCLUSION**

FedEx's motion for summary judgment [26] is denied. The parties are encouraged to attempt to reach a settlement.

ENTER:

Dated: September 8, 2010

_____
REBECCA R. PALLMEYER
United States District Judge